**Raymond REBIDEAU**

v.

**R. Kent STONEMAN, Commissioner of Corrections, State of Vermont.**

**Robert REUSCHEL**

v.

**R. Kent STONEMAN, Individually and in his official capacity as Commissioner of Corrections for the State of Vermont.**

**Civ. A. Nos. 75–3, 75–115.**

United States District Court,
D. Vermont.

June 19, 1975.

---

James R. Flett, Montpelier, Vt., for Rebideau and Reuschel.

Alan Cook and Robert L. Orleck, Asst. Attys. Gen., Dept. of Corrections, Montpelier, Vt., for defendants.

Before OAKES, Circuit Judge, and HOLDEN and COFFRIN, District Judges.

## MEMORANDUM AND ORDER

HOLDEN, District Judge.

The plaintiffs in these combined actions are Vermont state prisoners pres-

ently confined at the Windsor Correctional Facility.[1] They seek, *inter alia,* to enjoin defendant Stoneman, Vermont's Commissioner of Corrections, from transferring them to the federal prison system under authority conferred by state and federal statutes designed to accomplish such changes in penal custody. 28 V.S.A. § 706 (1975); 18 U.S.C. § 5003.

The single question presented to this three-judge court is whether injunctive relief should be granted to halt the transfers on the plaintiffs' claim that the challenged statute, 28 V.S.A. § 706(b) (1975), by its very terms, denied the plaintiffs equal protection of the laws in violation of the Fourteenth Amendment. Section 706(b) provides that:

> Notwithstanding any other provision of law, an inmate transferred to a federal correctional facility shall, unless otherwise agreed in a contract or contracts, be subject to the same law, rules, regulations, and procedures applicable to inmates committed for violations of laws of the United States, not inconsistent with the sentence imposed. Such law, rules, regulations,

and procedures applicable to Vermont prisoners confined outside Vermont may include but are not limited to matters of discipline, classification, segregation, visiting, mail, clothing or dress, use of telephones, personal property, employment, work release, furlough and transfer.

Added 1975, No. 21 (Adj.Sess.) § 1, eff. March 31, 1975.

For the reasons which follow, we conclude that the statute on its face does not offend the equal protection clause of the Fourteenth Amendment; accordingly, the plaintiff's request for injunctive relief on this ground is denied.[2]

Since the plaintiffs seek to enjoin a state official from executing a statute of statewide application,[3] and their complaints present constitutional claims that are not insubstantial, *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1972), the jurisdiction of this court is properly invoked. 28 U.S. C. §§ 2281, 2284; *see Gonzalez v. Employees Credit Union,* 419 U.S. 90, 94, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974). The plaintiffs' complaints, brought under 42 U.S.C. § 1983, additionally raise

1. At the time these complaints were filed, both plaintiffs were confined at the Windsor Correctional Facility. Reuschel had been incarcerated there since July 26, 1970, except for periods when he was confined at the Vermont State Hospital or had escaped from custody. Rebideau had been incarcerated at Windsor since August 19, 1972. The Windsor Classification Committee (an in-prison committee) classified Reuschel for federal transfer and Rebideau for in-state placement. The statewide Transfer Committee, made up of eleven members drawn from the Department of Corrections and the regional correctional facilities, recommended that both Reuschel and Rebideau be transferred to federal custody. Each plaintiff was afforded a hearing before an allegedly impartial hearing officer, who recommended that each be transferred to the federal system. The adequacy of the due process afforded the plaintiffs is not before the court as presently constituted. *See Gomes v. Travisono,* 490 F.2d 1209 (1st Cir. 1973), *vacated and remanded,* 418 U.S. 909, 94 S.Ct. 3202, 41 L.Ed.2d 153 (1974), *on remand,* 510 F.2d 537 (1st Cir. 1974). On June 3,

1975, the night before the hearing on this matter, Reuschel escaped from Windsor prison. He was recaptured the next day and defendant Stoneman sent him directly to federal custody in New York City. Plaintiff Rebideau was transferred to federal custody on or about June 10, 1975.

2. At the hearing on June 4, 1975, we denied from the bench plaintiff Rebideau's motion for temporary injunctive relief upon defendant Stoneman's assurance that Rebideau and others in federal custody would be returned to Vermont if and when their presence is required for these or other court proceedings.

3. Plaintiffs' counsel made it clear at the hearing before this court on June 4, 1975, that the prisoners were challenging Section 706(b) on its face. They challenge the defendant's authority to subject any state prisoner to federal prison rules and procedures under Section 706(b). Therefore, the requisite "statewide application" test has been met. *See Moody v. Flowers,* 387 U.S. 97, 101–102, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1966).

pendent state claims [4] and constitutional challenges to 28 V.S.A. § 706, as applied to Windsor prisoners who will be transferred to the federal prison system. These claims do not require adjudication by a three-judge court;[5] they will be reached by a single district judge upon dissolution of the present court with the filing of this order.[6]

The archaic Windsor prison is in its terminal stages. Defendant Stoneman announced on December 30, 1974, that he would close the Windsor Correctional Facility by June 30, 1975. He found the 187 year old prison to be "inadequate" in numerous respects. See 28 V.S.A. § 102(c)(11).[7] With the closing of the Windsor facility, their will be no long maximum security facility within the State of Vermont. To provide for those prisoners who require maximum security confinement, the defendant contracted with officials of the United States Bureau of Prisons to provide for the care and custody of approximately forty Vermont prisoners in this category.[8] At the hearing before this court on June 4, 1975, defendant Stoneman testified that, barring judicial intervention, the Windsor Facility would close as planned on June 30, 1975. By that date, the defendant plans to transfer approximately twenty-five maximum security prisoners to the federal prison system under the contract. The plaintiffs are two of the more than twenty prisoners held at Windsor who have filed complaints in this district, seeking to enjoin their transfer to the federal prison system.

The plaintiffs contend that Vermont law secures to its state prisoners certain rights which are not afforded to federal

4. By reaching the pendent state claims after the constitutional claims, the court does not deviate from the rule that state claims are to be considered first, without the necessity of reaching the constitutional claims if the statutory claims are dispositve. *Hagans v. Lavine*, 415 U.S. 528, 543–545, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). *See Philbrook v. Glodgett*, — U.S. —, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). Here, the state claims are not dispositive, and so the constitutional claims must be met. For this reason a three-judge court was convened. *See* n. 6, *infra*.

5. The constitutional challenges to the statute, as applied to Windsor prisoners, do not meet the "statewide application" test of *Moody v. Flowers*, 387 U.S. at 101–102, 87 S.Ct. 1544. The pendent state claims do not, of course, present a substantial constitutional question.

6. A single judge is forbidden to "dismiss the action, or enter a summary or final judgment" in any case required to be heard by three judges. 28 U.S.C. § 2284(5). *Gonzalez v. Employees Credit Union*, 415 U.S. at 96, n. 14, 95 S.Ct. 289. The single judge was, therefore, called upon to submit the issue required to be heard by a three-judge court before reaching the remaining claims challenged by the defendant's motion to dismiss.

7. 28 V.S.A. § 102(c)(11) provides that:
The commissioner is charged with the following responsibilities:
 (11) To close any correctional facility which he deems inadequate."

Defendant Stoneman testified at the June 4 hearing that he felt the Windsor prison cannot go on as a maximum security facility because it is not secure; prisoners can and do escape easily. *See Carlson v. Moeykens*, Civ.No.74–224, op. filed Jan. 11, 1975, as amended March 12, 1975 (D.Vt.). He found the "totally depressing, gloomy atmosphere" of the antiquated facility, plus the lack of constructive work programs there to frustrate prisoner rehabilitation. Until a small educational machine shop was installed recently, the only work for prisoners was in the print shop, making license plates or assisting in the prison kitchen. Defendant Stoneman testified that the continuing legislative unwillingness to allocate the necessary funds to run an adequate maximum security facility, plus the legislative decision to look to community corrections programs, was ultimately responsible for his decision to close the Windsor Facility.

8. On February 25, 1975, the State of Vermont, by defendant Stoneman, and the United States, by the Administrative Officer of the Bureau of Prisons, executed a contract which provides in part that:
 "The State may without prior approval transfer up to 40 state prisoners for commitment to a Bureau of Prisons facility
 . . . .
 State prisoners while in the custody of the Government shall be subject to all of the provisions of law and regulations applicable to persons committed for violations of laws of the United States not inconsistent with the sentence imposed."

prisoners and that their transfer to the federal prison system under the provisions of 28 V.S.A. § 706(b) would unconstitutionally deny them those state created rights. They maintain that in the following twelve areas they will be unconstitutionally disadvantaged in comparison with Vermont prisoners incarcerated in-state: (1) work release, (2) furlough, (3) personal property, (4) grooming, (5) clothing, (6) disciplinary hearings, (7) segregation, (8) good-time credits, (9) visiting, (10) correspondence, (11) telephone and (12) access to counsel. In the last four named, the plaintiffs contend that the additional burden of incarceration outside of Vermont, away from family and local ties, would unconstitutionally discriminate against them.

We are called upon to make a factual determination of the actual differences which prevail in treatment afforded Vermont prisoners incarcerated in-state as compared with those confined in federal facilities. We find that there is substantially no difference between Vermont's work release, 28 V.S.A. § 753 (1972), and furlough, 28 V.S.A. § 808 (1972), programs and the equivalent federal programs. *See* Bureau of Prisons Policy Statement (hereinafter BPPS) 7500.20B (11–16–71) (work release); BPPS 7300.12c (7–23–74) (furlough).

We find from the uncontroverted testimony of Commissioner Stoneman that the state programs were modeled in large part on the federal programs. Furthermore, the state prisoners who would be transferred to the federal system would not be eligible for Vermont work release or furlough status were they to remain in Vermont.

Windsor prisoners heretofore have been afforded the privilege of possessing personal television sets and record players only to fend off idleness at the inadequately equipped Windsor Facility. The use of television sets and record players is not a right secured to Vermont prisoners by rule or practice. The extent of personal property that can be kept by inmates varies from federal institution to institution as it does from state facility to state facility.

In matters of personal clothing, federal prisoners are generally required to wear uniforms, while state prisoners generally can retain and wear personal clothing. The only difference between the grooming requirements of the two systems is that federal prisoners cannot wear beards for security reasons, because federal officials claim that a beard can make a prisoner difficult to identify. *See* BPPS 7300.64A (4–15–75).

Vermont's disciplinary hearing procedure is set out in 28 V.S.A. § 852 and is supplemented by Disciplinary Regulations revised January 20, 1975. The purpose of the federal regulations on point, BPPS 7400.5C (10–4–74), is expressly "the incorporation of due process standards for inmate disciplinary hearings as prescribed by the Supreme Court in *Wolff v. McDonell.*" The differences between the two hearings procedures are that in Vermont the commissioner may designate a hearing officer to hear evidence and make findings of fact and recommendations to the disciplinary committee; the federal regulations do not expressly vest that discretion in an executive officer of the Bureau of Prisons. The federal regulations do provide for an appeal from a decision of the disciplinary committee. BPPS 7400.5C(10). Additionally, in Vermont an inmate has the right to be heard, 28 V.S.A. § 852(b)(3), while under federal procedure he has the right to be present with the assistance of a fulltime staff member, except during deliberation and where institutional security is jeopardized. BPPS 7400.5C 9(c)(2), (3) and (5) (10–4–74). In Vermont, prisoners have the statutory right to confront their accusers, 28 V.S.A. § 852(b)(2), and personally to question witnesses summoned by the committee or hearing officer, 28 V.S.A. § 852(b)(3). The federal regulations permit an inmate to have witnesses

called in and to present documents in his behalf, provided institutional security is not endangered.

The differences in pre-segregation disciplinary hearing procedures are outlined above. Vermont imposes a fifteen consecutive day maximum duration of segregation, 28 V.S.A. § 853(a)(1); the federal regulations provide for indefinite segregation with mandatory periodic reviews, BPPS 7400.5C 11(b). The loss of good time credits, in both the federal and state systems, is restricted to one month for a single disciplinary infraction. 28 V.S.A. § 812; BPPS 7400.5C 9(d)(4). The evidence establishes that Vermont and the federal Bureau of Prisons, in common, grant ten days a month of good time credit for good behavior. Vermont additionally vests in the facility directors the discretion to award an additional five days of credit a month. Commissioner Stoneman assured the court that Vermont's five day discretionary practice would carry forward and be applicable to Vermont prisoners in federal custody; that he personally would make the final decision as to the granting or restoration of good time credits for Vermont prisoners wherever they are confined. *See* 28 V.S.A. § 813.

Both the state and federal systems provide for the inspection of general correspondence, 28 V.S.A. § 802(a); BPPS 7300.1A 6(b) (8–13–74), and afford protection and privilege to communications with courts and attorneys. 28 V.S.A. § 802(b); BPPS 7300.1A 6(b), BPPS 2001.2B 10 (8–29–72). It appears that Windsor prisoners have enjoyed broad correspondence privileges for the same reasons that they have been allowed to possess personal television sets: to compensate for the lack of constructive rehabilitative programs at that facility. As with the television policy, the cor-respondence practice at Windsor does not vest in all Vermont prisoners' equivalent rights. Prisoners at Windsor have been afforded a more liberal telephone policy to meet the particular needs of that institution by reason of the inadequate facilities and programs at that facility. The plaintiffs have not demonstrated that the general federal telephone policy is significantly more restrictive than the Vermont policy as applied in other state facilities.

Finally, the plaintiffs contend that their access to counsel will be significantly restricted under federal regulations.[9] This develops from the lack of funds to provide Windsor or the other state facilities with adequate law libraries. To fill this shortage, Vermont, by statute, 13 V.S.A. § 5253 (1974), has mandated that the State Defender General shall provide legal services to persons in custody of the commissioner of corrections. In response to this legislative mandate, the Defender General created the position of Correctional Facilities Defender to be filled by a lawyer who would exclusively represent Vermont prisoners. It is the Correctional Facilities Defender who is ably representing these plaintiffs here and these and other Vermont prisoners in various other legal actions. Again it appears that the lack of alternative legal resources has prompted Vermont by statute, 28 V.S.A. §§ 804, 805, and regulation to allow state prisoners generous access to counsel within the confining institution. It is federal policy as well to allow reasonable access to counsel and the courts. BPPS 2001.2B(1) (5–8–72). Federal regulations provide for legal reference materials, law libraries, typewriters and other means to facilitate access to the courts. BPPS 2001.2B(4), (5), (6) and (7). Federal regulations

9. The plaintiffs contend that their transfer to the federal system, as a result of the administrative decision to close the Windsor Facility, abridges their Sixth Amendment rights to access to counsel and the courts. That constitutional challenge to the statute, as applied is not before this court. We are here considering only whether the legislative distinctions in access to counsel created by Section 706(b) deny the plaintiffs equal protection under the laws.

provide for private consultation with attorneys for the purpose of retention of counsel and to prepare for legal actions, BPPS 2001.2B(8) and (9). The frequency of attorney visits is regulated according to nature and urgency of the legal problems involved. Attorneys are required to make appointments with the Chief Executive Officer or his representative where prior notification is practicable. Federal regulations are consistent with the Vermont law in that the prison officials are prohibited from reading or copying correspondence between a prisoner and his attorney.

In addition to these differences which will attend the transfer of Vermont prisoners to the federal system, the court recognizes that difficulties may result from confinement outside Vermont, perhaps at considerable distances from home. Visitation may become more difficult, especially if relatives are without adequate funds to travel. Ready access to the Vermont Correctional Facilities Defender will be somewhat more difficult.[10]

With these differences in mind, we turn to the legislative history of the challenged statute. As first enacted, 28 V.S.A. § 706, added in 1971, No. 199 (Adj. Sess.), § 20 eff. July 1, 1972, authorized the Commissioner of Corrections to enter into and execute contracts with the United States for the transfer of any prisoner to federal custody, "when, in his opinion, the inmate needs particular or special facilities available at the federal correctional facility." The General Assembly amended Section 706 in 1975 to conform the statute with the transfer standards ordered by stipulation in *Bousley and Messier v. Stoneman*, Civ. No. 6679, op. filed June 11, 1973 (D.Vt.), (Coffrin, J.), and judicially adopted in *Carlson v. Moeykens*, Civ. No. 74–224, op. filed January 11, 1975, as amended March 13, 1975 (D.Vt.), (Coffrin, J.). The Legislature, anticipating the closing of the Windsor Facility, amended Section 706 at that time to facilitate the transfer of state prisoners who require maximum security confinement to federal custody. The defendant Stoneman, as Commissioner, had previously requested the Legislature to appropriate funds to build an in-state maximum security facility to house approximately fifty-five prisoners. The request was not granted. The Department of Corrections then proposed the amendment which included the provision challenged here. It was adopted on the representation to the Legislature that the amendment was necessary to enable an appropriate transfer of Vermont's maximum security prisoners to federal custody. 1975, No. 21 § 1(b) Approved March 31, 1975.

Transfer of prisoners to the federal system was adopted over correctional facilities in sister states for the reason that the federal system, with its vast resources and broad base of varying types of facilities for different classifications of persons committed to its custody, could better serve the needs of rehabilitation and confinement than any other correctional system. The federal policies of correction are more in keeping with those of the State of Vermont. Vermont's neighboring states are confronted with much the same budgetary problems that beset this state and the facilities available in the neighboring states are not equipped to accept additional out of state transfers. Section 706(b) was drafted and enacted to conform to federal policy and was merely declarative of Vermont's existing policy as to transfers to federal facilities.

18 U.S.C. § 5003 provides in part that:

(a) The Attorney General, when the Director shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory:

---

10. See n. 2.

*Provided,* That any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved.

\* \* \* \* \* \*

(c) Unless otherwise specifically provided in the contract, a person committed to the Attorney General hereunder shall be subject to all the provisions of law and regulations applicable to persons committed for violations of laws of the United States not inconsistent with the sentence imposed.

Added May 9, 1952, c. 253, § 1, 66 Stat. 68, and amended Oct. 19, 1965, Pub.L. 89–267, § 1, 79 Stat. 990.[11]

The contracts that were achieved between the state and federal governments were predicated on the premise that the transferred inmates would be subject to substantially equivalent treatment and regulations as those confined in Vermont. It was understood by both of the contracting agencies that each and every separate detail of Vermont treatment and regulatory policy could not be adopted and administered at the various federal facilities that might receive the Vermont transfers. And it was recognized that uniform treatment within a specified penal facility is a desirable correctional objective. Section 706(b) and the contract enacted pursuant to it were designed to serve the dual purpose of effectuating the transfer by meeting federal requirements and assuring that Vermont prisoners are treated as equally as varying conditions would permit within the receiving institution.

Section 706, as amended, granted to the Commissioner of Corrections the authority to create two classes of state prisoners: those who can appropriately be confined in existing Vermont correctional facilities of less than maximum security, and those who, by reason of their offenses, remaining terms and individual characteristics, require higher security detention and can properly be assigned to federal facilities. Section 706(b) will subject the class of state prisoners in federal custody to the differences delineated above, which amount to some variation of prison rules and procedures, with the possible hardships attendant upon confinement at some distance from Vermont. Given these differences, the classification authorized by the statute must be sustained unless it is "patently arbitrary" and bears "no rational relationship to a legitimate governmental interest." *Frontiero v. Richardson,* 411 U.S. 677, 683, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583 (1972). The traditional equal protection test requires no more than a showing of some rational connection between the statute under attack and a legitimate state purpose. *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). *Becker v. Levitt,* 489 F.2d 1087, 1090–1091 (2d Cir. 1973), *cert. denied,* 416 U.S. 985, 94 S.Ct. 2388, 40 L.Ed.2d 762 (1974). This analysis applies to classifications made in the administration of a state penal system. *McGinnis v. Royster,* 410 U.S. 263, 270, 276, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).

We hold that the classifications created by Section 706(b) are not patently arbitrary and bear a rational relationship to a legitimate governmental interest. The state has a valid governmental concern, in the interest of public safety, and the welfare of prisoners committed to its custody, to maintain "security, safety and order at the correctional facilities . . . ." 28 V.S.A. § 102(c) (6), (17). The discharge of this responsibility calls upon the State to protect the health and welfare of the general public and to provide a secure correctional atmosphere for prisoner rehabilitation. The defendant, exercising the sound discretion entrusted to him by 28 V.S.A. § 102(c)(11), made the decision

11. This statute has withstood constitutional challenges in the past. *Duncan v. Madigan,* 278 F.2d 695 (9th Cir. 1960), *cert. denied,* 366 U.S. 919, 81 S.Ct. 1096, 6 L.Ed.2d 242 (1960); *see also Dwyer v. State of Alaska,* 449 P.2d 282 (Alaska 1969).

to terminate the operation of Windsor state prison. That this institution is insecure, antiquated and inadequately serves the needs of rehabilitation is not questioned. The legislative responsibility to provide appropriate custody for maximum security prisons, consistent with the state's interest in providing "security, safety and order at the correctional facilities," persuaded the General Assembly to provide for the transfer to the federal system, rather than to construct and maintain a new maximum security facility for the relatively few inmates requiring such confinement. The challenged statute was enacted to serve and fulfill that need. It appears that the means adopted should achieve the legislative objective. In this, the enactment satisfies the demands of equal protection standards. *See* Gunther, *Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a New Equal Protection,* 86 Harv.L.Rev. 1 (1972).

The plaintiffs' argument that the Vermont Legislature has established certain rights for its prisoners and imposed on the Department of Corrections certain duties which cannot be abrogated by transferring state prisoners to the federal system under Section 706(b) is without merit. The Legislature passed Section 706(a) in 1971 and added Section 706(b) this year to accomplish just such transfers.

According to the law of Vermont "every statute is understood to contain by implication, if not by its express terms, all such provisions as are necessary to effectuate its object and purpose, and to make effective the rights, powers, privileges, and jurisdiction that it grants; and what is implied in a statute is as much a part of it as what is expressed." *State Highway Board v.*

*Gates,* 110 Vt. 67, 72–73, 1 A.2d 825, 827 (1938). It is presumed that in the enactment of Section 706(b) the General Assembly acted with full knowledge of prior legislation on the subject. *See Scot v. St. Johnsbury Academy and Trustee,* 86 Vt. 172, 175, 84 A. 567 (1912); *Donoghue v. Smith,* 119 Vt. 259, 263–264, 126 A.2d 293 (1956).

We recognize that under Section 706 (b) and the contract entered into pursuant to that provision, Vermont prisoners who are confined in federal facilities will be subject to rules and procedures that will be variant in some particulars from those applicable to inmates held within the state. Some of the variations will undoubtedly be less advantageous from the inmate's point of view than those rules presently prevailing within the state facilities. Many of the transferred inmates will gain from the more adequate benefits of the expansive federal system. Should it develop that federal treatment and procedures, as applied to the inmates, transferred, trench on constitutionally protected rights, a Vermont prisoner would have standing to challenge that if and when, such deprivation occurs.[12]

As we have seen, Chapter 11, Vermont Statutes Annotated, governing the supervision of adult inmates at state correctional facilities, established by statute certain procedures and privileges for inmates which are consistent with those promulgated by regulation in the federal system. Some are designed to promote observance of constitutional standards established by the courts. Others exceed constitutional demands. Those provisions which are of constitutional dimension must be duly observed and kept by the administrators of both systems. *See generally, Wolff v. McDonell,* 418 U.S. 539, 94 S.Ct. 2963, 41

---

12. In many of the areas covered by the plaintiffs' complaints, recent United States Supreme Court decisions have established constitutional standards which must be afforded to all prisoners. *E. g. Wolff v. McDonell,* *supra, Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), *aff'g Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970).

L.Ed.2d 935 (1974); *Cruz v. Beto, supra; Harnes v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Significant differences in inmates and available facilities afford the basis for different treatment and procedures within a constitutional framework. *See McGinnis v. Royster, supra,* 410 U.S. at 271, 93 S. Ct. 1055.

 Rights and privileges which are not constitutionally guaranteed may be varied and diminished by the needs and exigencies of institutional environment. *Wolff v. McDonell, supra.*

> Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a "retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

*Id.* at 555, 94 S.Ct. 2963, 2974. This, of course, does not mean that constitutional rights may be diminished. But there is no guarantee that a person lawfully convicted has a constitutional right to be confined in a particular institution or in a particular state where his sentence was imposed.

 Despite the impairment to visitation of family and friends and the difficulties of access to Vermont counsel, these problems are not constitutional barriers to the operation of the statutory design. *Gomes v. Travisono,* 490 F.2d 1209 (1st Cir. 1973), vacated and remanded, 418 U.S. 908 (1974), *on remand,* 510 F.2d 537 (1st Cir. 1974). *See also Lindsay v. Mitchell,* 455 F.2d 917 (5th Cir. 1973); *Rodriguez-Sadoval v. United States,* 409 F.2d 529, 532 (1st Cir. 1969), *cert. denied,* 414 U.S. 869, 94 S.Ct. 180, 38 L.Ed.2d 115 (1973); *Duncan v. Madigan,* 278 F.2d 695, 696 (5th Cir. 1960), *cert. denied* 366 U.S. 947, 81 S.Ct. 1675, 6 L.Ed.2d 858 (1961).

One difference in the comparative systems, not specifically referred to in § 706(b), but pressed by the plaintiffs, deserves mention. It appears that a more restrictive policy in the granting of good time credits prevails for federal prisoners. As stated above, the court sioner of Corrections that the granting was assured by the Vermont Commis- and retraction of such credits will be applied in the same manner to inmates transferred to the federal system as with those retained in Vermont. In this posture of the record we are not called upon to determine whether an unanticipated departure from this assurance would in effect result in a denial of equal protection.

To the extent that 28 V.S.A. § 706(b) engrafts variant federal treatment and prison procedures on inmates transferred to federal custody, none have been shown to offend rights which are constitutionally protected. The statute on its face is neither arbitrary nor capricious. It is designed to serve legitimate governmental interests of the State of Vermont.

The plaintiff prayer for injunctive relief on the ground the statute patently denies the plaintiffs' equal protection of the law is denied. Since this is the only issue that required determination by this court as constituted under 28 U.S.C. § 2284, the causes will be remanded to the district judge with whom they originated for determination of the remaining issues presented by the pleadings, including questions of constitutional application of the statute.

It is so ordered.