**Edward BATTICK**

v.

**R. Kent STONEMAN, Individually and in his capacity as Commissioner of Corrections for the State of Vermont.**

**Civ. A. No. 75–17.**

United States District Court,
D. Vermont.

March 22, 1976.

---

5. Continued Deposition of Andy Dinko, Apr. 22, 1975, at 187.

James R. Flett, Montpelier, Vt., for plaintiff.

Robert L. Orleck, Alan W. Cook, Asst. Attys. Gen., Dept. of Corrections, Montpelier, Vt., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOLDEN, Chief Judge.

This action was brought by the plaintiff for declaratory and injunctive relief under 42 U.S.C. § 1983 (1970) against the Commissioner of Corrections for the State of Vermont to prevent his transfer from the Vermont Corrections Department to the Federal Prison System. Plaintiff contends that his transfer and incarceration outside of Vermont, because of the defendant's administrative decision to close the State's only maximum security prison for economic reasons, have violated his rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as the constitution and statutes of the State of Vermont. Jurisdiction is invoked under 28 U.S.C. § 1343 (1970).

The cause of action is related to various companion cases that were generated by the application of the provisions of the Vermont statutory law (28 V.S.A. § 706). The statute was constitutionally challenged in a proceeding in this court constituted under 28 U.S.C. § 2284. *Rebideau v. Stoneman*

and *Reuschel v. Stoneman,* 398 F.Supp. 805 (D.Vt.1975). The three-judge panel denied injunctive relief against the transfer of Vermont prisoners to the custody of the Federal Bureau of Prisons. In reaching this result the court held the statute did not patently deny equal protection of the laws to the prisoners who were transferred into the federal system. The question of whether federal rehabilitative treatment and the procedures involved in the transfer trenched upon other constitutionally protected rights of transferred prisoners was reserved for decision by a single district judge upon dissolution of the three-judge court. *Id.* 813–814. The legislative history of the statute and the factual background which caused its enactment are fully set forth in reported cases and will not be repeated here. Proceeding to the application of the statutes as applied to this plaintiff, Edward Battick, the court finds and reports the facts which follow.

### The Vermont Correctional System

The abandonment of the state prison at Windsor reduced the Vermont correctional facilities to several minimum security Community Correctional Centers located at various localities throughout the state and the St. Albans Diagnostical Treatment Facility near the Canadian border. The function of the community centers is to integrate prisoners into the community through work release and furlough programs over an anticipated period of time ranging from six months to nine months. In some isolated instances the period has been extended as long as two years.

The St. Albans facility has limited medium security capacity. It functions as a holding point for inmates that the Department of Corrections expects to place in community correctional centers in the foreseeable future. It provides programming for the resident inmates in an environment of constant supervision; it also contains a diagnostic component. It has a small inner perimeter security component for short-term incarceration of high security inmates. St. Albans is not designed for custody of long-term inmates who present a high security risk. Prisoners in this category are not eligible to participate in programs conducted outside the protected security area. It is the considered judgment of the correction officials that, absent the incentive of early release, which is the primary goal of the majority of the St. Albans inmates, maximum security residents are likely to produce an adverse effect on the programs offered to short-term offenders and tend to be disruptive to their rehabilitation.

### Transfer Procedure

With the impending closing of the prison at Windsor, the defendant, as Commissioner of Corrections, directed his subordinates to develop procedures and criteria for determining out-of-state transfers. This resulted in a revision of the Department Policy No. 891, designed to establish the criteria for transfer and the procedure for recommendations for such transfers.

Revised Policy No. 891 provides that Vermont prisoners could be transferred out of state if one or more of three criteria were met:

1. All in-state treatment and rehabilitative programs available for that individual have been considered and determined unsuitable.
2. All in-state alternatives in the area of security have been considered and found unsuitable for providing the required degree of security or protective custody for a particular resident.
3. A resident voluntarily requests transfer.

These guidelines are consistent with judicial suggestions made in *Bousley & Messier v. Smith,* Civ. No. 6679 (D.Vt. June 11, 1973) concerning appropriate criteria for out-of-state transfer and are in keeping with the dictates of 28 V.S.A. § 706 as amended.

The administrative procedure established for making the decision on transfer of an inmate out-of-state was designed to conform with the guidance indicated in *Carlson v. Moeykens,* Civ. No. 74–224 (D.Vt. filed Jan. 24, 1975, amended Mar. 13, 1975). It consisted of a four stage decision process.

The Commissioner selected two existing administrative groups in the Department of Corrections to make the preliminary decisions on transfer cases to avoid arbitrary action by the warden. The Classification Committee developed the initial recommendations based on its knowledge of the history and programs of each inmate, as well as personal consultations with him. The written recommendation of the Classification Committee was reviewed by the Transfer Committee of the Department of Corrections. This committee, which had been in existence for six years, had functioned to screen all transfers between institutions in the Department of Corrections on a monthly basis. Its membership included the superintendents of all Vermont correctional facilities, all key correctional personnel with programming responsibilities and the Deputy Commissioner, the committee chairman. The Transfer Committee recommendation was considered at a formal hearing conducted before a hearing officer. At this hearing, the inmate was afforded notice of the hearing. He was informed of his rights at the hearing and of the reasons for the proposed transfer. He was given the opportunity to testify in person, to call witnesses and produce documentary evidence in his behalf. Representation by staff counsel was available. The hearing officer prepared a written decision stating the reasons for his recommendation. From the decision of the hearing officer, the transfer case was presented to the Commissioner, who reserved the discretionary power to approve or disapprove the recommended placements. [See Appendix A attached, for the text of Vermont Department of Corrections Policy No. 891, as it relates to procedures for out-of-state transfers.]

### Case History of Edward Battick

Edward Battick is presently serving a life sentence for the murder of the chief of police of Manchester, Vermont. The offense was committed during an attempted burglary on the night of December 12, 1972, of a drug store in the Village of Manchester.[1] In the course of the burglary, the plaintiff suffered multiple gunshot wounds as the result of an exchange of gunfire with police officers.

Battick had moved to Manchester from Connecticut the preceding March. He lived in a hunting camp on the outskirts of the village until December 12, 1972. He was unemployed and was receiving unemployment compensation benefits from the State of Connecticut.

Following his arrest on December 12, 1972, the plaintiff received brief treatment at a hospital in Bennington, Vermont and was then transferred to the Medical Center Hospital at Burlington, Vermont. There he underwent a series of operations, to repair the damage caused by the various gunshot wounds, under the care and direction of Dr. James DeMeules, a thoracic surgeon. On May 22, 1973, Dr. DeMeules performed a surgical procedure which is referred to as a right colon transposition. The operation replaced part of his severely damaged esophagus with a segment of the large intestine. As a consequence of the colon transposition, plaintiff must undergo periodic maintenance-type operations on his repaired esophagus, called esophageal dilatations. This operation is required on a regular basis, to widen the stricture where the colon and the esophagus were joined, to prevent impairment of the plaintiff's ability to swallow.

Dr. DeMeules testified that generally either of two procedures can be used to perform the dilatations. The choice depends on the particular type of stricture involved. The first method, referred to as string method, requires that the patient swallow a string several days before the operation to allow the string to anchor itself; then a

1. The judgment of conviction entered on a plea of guilty during trial by jury in the state superior court. (Since the victim of the offense was a law enforcement officer murdered while in performance of duty apparently the plea was negotiated to avoid the extreme penalty of death, if the jury should so determine. See 13 V.S.A. § 2303(b)). The conviction was affirmed on appeal by the Supreme Court of Vermont in an opinion filed December 2, 1975. *State v. Battick*, 133 Vt. 558, 349 A.2d 221 (1975).

series of progressively larger rigid dilators are guided into the esophagus over the string until the stricture is dilated to a reasonable size. The second procedure involves the use of a rubber tube filled with mercury and tapered at one end. The tube is inserted through the mouth into the esophagus and into the area of the obstruction. This method is used in cases where the passage from the mouth to the stricture is tortuous and can be performed with or without the aid of a fluoroscope, to provide the surgeon with a continuous x-ray picture of the progress of the operation. The vast majority of esophageal dilatations are done with a local anesthesia, but occasionally the difficulty of the dilatation and the tolerance level of the patient will dictate the use of a general anesthesia. In the opinion of Dr. DeMeules, an ordinary thoracic surgeon, without any special knowledge of the particular case, would use the string method of dilatation under a local anesthesia.

After the transposition operation, the plaintiff required and received esophageal dilatations on a regular basis, approximately every six weeks, performed by Dr. DeMeules at the Medical Center. Although the need for this care will continue into the indefinite future, the frequency of need for the dilatations can be expected to diminish with time. At plaintiff's initial dilatation sessions, the string method was attempted by Dr. DeMeules. Because of the lack of peristalsis in the plaintiff's transposed esophagus, the string was never able to anchor itself so as to allow the procedure to be performed. After three of four attempts Dr. DeMeules abandoned this procedure in favor of the "tube" method with the aid of fluoroscopy. Dr. DeMeules chose a general anesthesia in these early dilatations because of his uncertainty regarding the difficulty of plaintiff's particular case. Later, after a number of dilatations, Dr. DeMeules attempted to use a local anesthesia. When the plaintiff experienced gagging and other tolerance difficulties, his surgeon returned to the use of a general anesthesia.

During the long course of his hospitalization and his extensive medical treatment,

the plaintiff developed great confidence in Dr. DeMeules. He believes Dr. DeMeules saved his life. He prefers that all of his future medical care and treatment be ministered under his personal care and supervision. The plaintiff's transfer to the federal system deprived him of this advantage.

A thoracic surgeon is best qualified to perform the surgical procedures which the plaintiff is required to undergo. However, according to Dr. DeMeules, a qualified general surgeon would have the capability of performing the operation without impairing the plaintiff's health. Eventually the plaintiff should be able to tolerate the maintenance operations with local anesthesia.

During the plaintiff's extended stay at the Medical Center he became acquainted with several employees of the hospital, whose visits and support, along with that of the family, sustained him through the physical and psychological rigors of his hospitalization. Some of those friendships continued after the plaintiff was transferred from hospital custody to the Vermont correctional facilities.

On August 20, 1973, plaintiff was released from the hospital and lodged in the Burlington Community Correctional Center during the pendency of his trial. He pleaded guilty to first degree murder and was sentenced to life imprisonment. Thereafter the plaintiff was incarcerated at the Windsor prison, where he remained until his transfer to the federal system on June 25, 1975. Throughout his stay at Windsor the plaintiff continued to be treated every five to eight weeks by Dr. DeMeules at the Medical Center Hospital.

In January, 1974, the plaintiff enrolled in four courses in a college program offered at Windsor. He completed two of the courses with favorable evaluations from his instructors. Plaintiff's studies continued through the next academic year. By the spring of 1975 he had accumulated 24 or 25 college credits toward an associate arts degree.

In the early months of his incarceration at Windsor the plaintiff visited and did some occasional work in the Arts and Crafts

program at the prison. As his medical condition improved he became more involved in woodworking. In April, 1974, he was formally assigned to the Arts and Crafts section as part of his rehabilitation and treatment programming at the prison. He became skilled in various aspects of woodworking and eventually, with the assistance of friends and relatives, was able to market various items of furniture, wooden jewelry and carvings.

In August, 1974, plaintiff was moved to the prison honor block, a dormitory style unit that afforded him frequent access to the telephone. There he remained until transferred out of state.[2] While a resident of the honor block, the plaintiff maintained a good conduct record, attended his work program regularly and kept his cell and the cell block in good condition. Although plaintiff's behavior at the Windsor prison was generally considered appropriate by the prison personnel,[3] he was at all times considered a maximum security risk by the prison officials.

Throughout the period of incarceration at Windsor, the plaintiff's family visited him during each month, travelling from their home in Hamden, Connecticut, a distance of 170 miles from the prison. Two of his

friends from the Medical Center at Burlington also regularly visited the plaintiff at Windsor. The visits from his friends and relatives and his active participation in the programs offered at Windsor, were important factors in the plaintiff's prison life and rehabilitation.[4]

### Transfer Procedure

The procedural machinery established by the Vermont Department of Corrections for the proposed transfers began functioning early in the spring of 1975. Thomas Coxon, the chairman of the classification committee, compiled information for workups on all the prisoners anticipated to be transferred from Windsor, in preparation for the transfer committee meetings. Prior to the meeting of the classification committee on April 30, 1975, the Deputy Commissioner of Corrections, Cornelius Hogan, had instructed Coxon to investigate placement of plaintiff in his home state of Connecticut. Coxon asked the prison physician, Dr. Shaw, who has since deceased, to contact medical personnel in the Connecticut penal system and Dr. DeMeules to ascertain the feasibility of placement of Battick in Connecticut. Dr. DeMeules indicated that there would be no medical reason why the plaintiff could

---

2. The criteria for admission to the Honor Block include:
   1. A man must be in residency in this institution at least 90 days before consideration can be made by the Classification Committee.
   2. A man must have a job assignment and be reporting to work with regularity, except in cases of sickness or convalescence.
   3. A man must not have any disciplinary reports, reprimands or white tickets resulting in disciplinary action during the 90 days prior to submitting his request to the Classification Committee. If convicted of white ticket the waiting period is 120 days for first offense and 30 extra days on every other offense convicted of.
   4. A man with an escape or walkaway from any correctional facility on his record will not be eligible for consideration for residency for at least 6 months following conviction, and provided he meets the other criteria for residency.
   5. A man convicted of forcible escape will not be eligible for one year.

6. A man who commits an assault on an officer and is convicted will not be eligible for at least one year.

    *     *     *     *     *     *

Vermont Department of Corrections Official Bulletin No. 523 (Revised), dated 8–27–74.

3. The only disciplinary action taken against Battick during his incarceration at Windsor was a five day revocation of "night privileges" resulting from three minor reprimands.

4. Armand Grams, a faculty member of the University of Vermont, who conducted a course in Human Development at Windsor, gained some personal familiarity with plaintiff as a student in the program. In testifying as to the psychological effect of a transfer out-of-state on Edward Battick, Grams thought that the loss of the support system the Windsor environment afforded would be a setback in plaintiff's rehabilitation, though not an irreparable setback. He considered plaintiff's capacity for adjustment "good" and his desire for rehabilitation "great."

not be transferred, provided a thoracic surgeon was available for periodic surgical procedures required by the plaintiff's condition. The Connecticut Correctional System reported that it was capable of handling plaintiff's medical problem.

In April, plaintiff was informed by Coxon of the contemplated placement in Connecticut. Plaintiff informed Coxon that he would prefer to remain in Vermont but, if out of state transfer were inevitable, he desired placement in Maine, rather than Connecticut or the federal system. At the classification committee meeting on April 30, Battick was formally advised of the Department's recommendation to transfer him out-of-state and its efforts at placing him in Connecticut. The plaintiff did not welcome this prospect and voiced his preference for placement in Maine.

During early May the Department explored this possibility to no avail, since the Maine correction officials would not accept the plaintiff. The Connecticut alternative was also abandoned since no cooperation had been forthcoming from the Connecticut prison system and the plaintiff expressed no interest in placement in that state.

Edward Battick was one of 20 to 30 prisoners considered by the transfer committee on May 29, 1975. Mr. Coxon presented the case to the committee, along with the classification committee's recommendation for out-of-state transfer to the federal system. Plaintiff was then called into the meeting and informed by the Chairman Hogan that he was being recommended for out-of-state placement. The committee members all testified at trial that one of the principal considerations underlying their recommendation was the length of plaintiff's sentence. The Vermont Correctional programs are not designed for long term residents. Furthermore, the Vermont system was inadequate, in terms of security, to maintain custody of the plaintiff on a long term basis. The transfer committee's recommendation was for out-of-state placement under criterion 1 of Policy No. 891: "All in-state treatment and rehabilitation programs

available for that individual have been considered unsuitable."

On June 3, 1975, plaintiff was given written notice by the warden of a hearing to be conducted on June 5, 1975, before a hearing officer concerning the proposed transfer to the federal prison system. The notice advised plaintiff of his right "to call relevant witnesses . . . make statements . . . and ask questions." The plaintiff was offered the "assistance of a Staff Member of [his] choice if he is reasonably available." The reasons enumerated for the proposed transfer included both criteria.

Plaintiff elected to have his counselor, Richard Knight, assist him in the preparation and presentation of his case before the hearing officer. Between June 3 and June 5 they spent several hours in preparation of the plaintiff's case.

On June 6, 1975, plaintiff was afforded a hearing before the Department of Corrections hearing officer, Avery Smith, a district supervisor of probation and parole. Initially, plaintiff was informed by the hearing officer of his right to present witnesses, documentary evidence and the right to cross-examine opposing witnesses and the state's representative, Mr. Coxon. The state's position was briefly stated by Coxon:

The department's position regarding Mr. Battick is that there's simply no programs available within the Vermont Correctional system once this facility closes on June the thirtieth, or thereabouts. It's noted in the transfer notes from the Deputy Commissioner that Mr. Battick just began serving a life sentence for first degree murder on twelve—twelve, seventy-two. Ah, he was convicted of murder in the first degree with a life sentence; obviously a very serious offense, ah, I'm sure of, well, and because of this, ah, the length of the sentence that, ah, we considered all the in-state alternatives, ah in the area of program and along with that in the areas of security and it was determined that there simply are no programs available, ah, to provide the, ah long-term program in this state. Ah, his relative chances of place-

ment in a community-based or community oriented program just do not exist at this time. Ah, and, to—quite frankly, it's a very simple matter as far as the department is concerned. You have a life sentence, ah, it obviously is a long sentence. You just began serving. It's a very serious offense, ah, murder in the first degree, that it will require placement in an out-of-state facility, ah, for a reasonable period of time and, ah, based on that, ah, we think it's an appropriate referral.

Transcript of hearing of June 6, 1975 at 3.

For the remainder of the hearing, plaintiff and his counselor, Richard Knight, presented a lengthy argument and called correctional department employees as witnesses. The main point of plaintiff's contention was that in-state programming, capable of sustaining his educational and woodworking interests, was available to him at the St. Albans Correctional Facility. Coxon refuted the plaintiff's claims on the grounds that the St. Albans facility was unsuitable in terms of its programming, security and the policy of excluding offenders with lengthy sentences with no reasonable prospect of integration into community-oriented programs in the foreseeable future. The plaintiff presented testimony at the hearing concerning his need for the availability of a thoracic surgeon wherever he would be incarcerated because of the required medical maintenance of his esophagus. He expressed concern about the availability and quality of medical care in the federal prison system. Coxon assured the hearing officer that the federal system could provide plaintiff with adequate medical care:

I would also point out that, in that regard, that the late Dr. Shaw had talked with people outside the state, if you will, recall, in regards to him, and his situation medically; and I'm quoting now, 'Dr. Shaw explained the medical situation and indicated it could be handled,' ah, 'that it would have to be handled by a physician, but physicians were available both in Connecticut and the federal system that could handle the situation.'

Transcript of Hearing of June 6, 1975, at 11. Some doubt surrounds Mr. Coxon's representation that the availability of medical care in the federal system had actually been thoroughly investigated at that time.[5] The plaintiff produced witnesses who testified in his behalf. He was ably and competently represented by lay counsel of his choice. The plaintiff and his staff advisor had continuing access and support from the Defender General's office. The hearing officer was fair and impartial.

On or about June 13, 1975, the hearing officer made his recommendation to the final authority, defendant Stoneman. He recommended:[6]

That the proposed transfer of Resident Edward Battick be upheld, but on the basis of satisfaction of Criterion I of the Policy Bulletin 891 only.

That Resident Edward Battick's case be carefully reviewed in not less than two years with a view toward determining his eligibility to return to the Vermont Correctional System. (See Defendant's Exhibit H)

And the hearing officer gave his reasons for the recommendation as follows:[7]

5. Dr. Shaw earlier had been specifically requested to investigate the medical situation in Connecticut and the results of that investigation are in evidence. Coxon's representation that Dr. Shaw had assured him that the federal prison system could handle Battick's medical problem is not corroborated by any evidence of any inquiries made by Dr. Shaw to the federal prison system; perhaps any such assurance was simply based upon Dr. Shaw's general understanding of the quality of medical care in the federal system.

6. Of the 31 transfer cases heard by Avery Smith, he rejected the decision of the Transfer Committee in three cases involving two individuals and reversed their decision in part in three other cases involving three individuals.

7. Avery Smith testified that his decision on the Battick hearing rested both on the presentation of the issues by the parties and on his general awareness of the reputation of the federal prison system as having first class facilities and programs available in most areas.

1. On the basis of a letter, (dated May 5, 1975, from Mr. Thomas M. Coxon to Mr. Joseph Zizzamia) in which it is stated, 'He (Battick) has not been a problem in custody and appears to have made a positive adjustment to his sentence.', plus the fact that his case file reveals only minor rules infractions; the requirements of proof of the applicability of Criterion II, dealing with security do not appear to be met.

2. The assurance that competent medical treatment will be available to Resident Battick within the Federal Bureau of Prisons appears to resolve the question.

3. The educational program alone cannot suffice to sustain Resident Battick's treatment needs in view of the very long sentence which awaits him, at this time.

4. His interests in vocational and arts and crafts programs and continued education can be met within the Federal Bureau of Prisons system.

5. The good progress made to date by Resident Battick does merit special review and consideration when he has reached a point in his sentence that affords some hope of short-term community planning presently available in Vermont.

Following receipt of the report of the hearing officer, the defendant, as Commissioner of Corrections, conducted a review of plaintiff's case. This included a personal analysis of the key documents and evaluations in plaintiff's file. Based on the recommendations before him and his personal knowledge of the existing Vermont correctional programs and security alternatives, the Commissioner approved the plaintiff's transfer, concurring with the hearing officer's recommendation for transfer based on criterion number one of Policy No. 891.

The Commissioner recognized that all Vermont treatment and rehabilitative programs are geared to a program goal which includes reintegration into the community within the foreseeable future, normally a period of three years, except in extraordinary circumstances. The Commissioner concluded that plaintiff had no prospects for return to the community unless he received a pardon from the Governor. The possibility of executive pardon at that time was remote because of the nature of the plaintiff's crime, the community's opposition to clemency for the plaintiff and the fact that the plaintiff had served but a short time on his life sentence.[8]

Although criterion two of Policy No. 891 was not stated as a basis for his decision, the defendant testified that security was an important factor for a variety of reasons. These included the serious nature of plaintiff's crime. The Vermont corrections officials had regarded the plaintiff as a maximum security prisoner.[9] Due to the relatively short period of time the plaintiff was in a custodial environment, they had only a limited opportunity to observe his behavior and evaluate his motivations. At the time of transfer the plaintiff had not demonstrated that his security classification should be modified. The nature of his crime, the length of his sentence, with little possibility of early release, and his prior felony conviction, fully justified his classification as a high security risk. His transfer was ordered for security reasons and the absence of in-state facilities and programs for high security risk offenders.

Before signing plaintiff's transfer order, Commissioner Stoneman inquired about the plaintiff's medical problem and received further assurances of the adequacy of his care in the federal system. The order was signed on June 18, 1975, directing that plaintiff be transferred on June 25, 1975.

---

8. The plaintiff presented evidence that a recent unofficial study of prisoners serving life sentences in Vermont during the period 1960–70 indicated that executive pardons had been granted on the average after incarcerations of from 7 to 7½ years.

9. In addition, prior to the offense for which plaintiff was incarcerated in Vermont, he had been convicted of other criminal offenses, including three counts of breaking and entering in 1965 and malicious destruction of property in 1968.

Plaintiff received a written copy of the transfer decision on June 23, 1975. During that week the defendant requested Peter Profera, Director of Community Corrections, to ascertain that all medical aspects of the pending transfer had been resolved. This prompted a series of communications between Profera and the associate warden at the Federal Detention Headquarters in New York City, the receiving facility for Vermont prisoners entering the federal system. These communications were for the purpose of coordinating the medical aspects of plaintiff's transfer. Plaintiff's medical history and treatment procedure from Dr. DeMeules were forwarded to New York, preparatory to plaintiff's arrival. The defendant was satisfied that there were no serious medical problems against the transfer and Battick was transferred on schedule.

### Federal Custody

Upon arrival at New York, plaintiff received immediate medical attention and was designated for transfer to the Federal Medical Center at Springfield, Missouri, for an extensive medical evaluation. Arrangements were made to transport plaintiff to Missouri with brief stopovers at the Lewisburg and Leavenworth Federal Penitentiar-

ies. At the time the plaintiff arrived at Lewisburg, however, a moratorium on transfers to the Springfield facility was issued by the Bureau of Prisons and it was decided to retain plaintiff at Lewisburg until the hold on such transfers was lifted.

Upon his arrival at Lewisburg, plaintiff was initially segregated in a holdover status. Transient prisoners, who normally remain in the institution for less than a month, are designated as holdovers and, for administrative reasons, are not assigned to case workers, nor given job assignments, and are subjected to a more restrictive policy regarding phone calls and visiting privileges.

Upon arrival at Lewisburg, the plaintiff was placed in administrative segregation. After five days he was then transferred to the prison hospital, but remained in segregation. While in segregation the plaintiff was permitted to be out of his cell only two hours per week for exercise and showers. He was subsequently placed in another ward in the prison hospital where he had free access to all hospital facilities.[10] While in this ward the plaintiff, on several occasions, was permitted to use the prison law library. He attended movies and had access to the prison yard.[11]

10. The hospital at Lewisburg has a full time medical staff of three physicians, two psychiatrists and ten physicians' assistants, as well as contracts with numerous consultants in all of the major medical specialties. It also is staffed to provide 24 hour emergency services. A doctor lives on the prison grounds and all doctors live within 10–15 minutes of the prison. The capabilities of the Lewisburg Prison hospital in the area of emergency services far exceed those available at any facilities of the Vermont Department of Corrections at the present time or at any time during plaintiff's prior stay in this State.

11. Considerable testimony was introduced by the plaintiff in support of his contention that his lines of communication, via the mails and the telephone, were inadequate, unduly restricting his access to counsel and his family. Much of the mail sent to the plaintiff during his first month at Lewisburg was routed to the prison at Springfield, where Battick was originally assigned. The error was corrected late in July and regular service established. Also, as a holdover, plaintiff's access to the telephone

was considerably more restricted than that he had enjoyed at the Windsor Prison. To a large extent, administrative realities dictated this restriction. Because of the position of Battick as a holdover, whenever he placed a phone call a staff member had to accompany him. The prison administration considered this a poor use of its staff personnel and consequently encouraged written correspondence and discouraged phone calls.

While at Lewisburg, plaintiff had three or four phone conversations with his family; and returned four phone calls placed to him by his counsel in Vermont, within, at most, two days of the time the call was placed to him. After the first two calls from plaintiff's counsel, Robert Sinsheimer, a case management coordinator, expressed reluctance to allow continued frequent phone calls between plaintiff and his attorneys. After Sinsheimer was informed of the pending litigation in Vermont, he acquiesced to continued phone contacts. One phone conversation between plaintiff and his counsel was terminated after approximately fifty minutes and two requests to end the conver-

In mid-July, 1975, arrangements were made for the plaintiff to receive his periodic esophageal dilatation at the Geisinger Medical Center, a nearby hospital with facilities and staff generally comparable to that of the Medical Center Hospital at Burlington, Vermont. On July 23 plaintiff was transferred to the Geisinger Medical Center and Dr. Vincent Varano informed him that he would attempt the dilatation without use of a general anesthesia. Plaintiff explained to Dr. Varano the difficulties which had earlier been encountered by Dr. DeMeules performing the dilatation under only a local anesthesia, and, as a result, the operation was not performed and another appointment was made with a second doctor. At the second appointment, Dr. Rothman successfully prevailed upon plaintiff to attempt the dilatation without the general anesthesia. The dilatation was aborted when it became apparent that plaintiff was unable to tolerate the procedure. A third dilatation, under general anesthesia, was scheduled for August 18. At this session, Dr. Donald Vrabec attempted to perform the dilatation by the so-called "string" method, but for the same reason that Dr. DeMeules had been unsuccessful attempting this method two years earlier, the dilatation was terminated.[12]

Battick was returned to Lewisburg several days later and shortly thereafter transferred back to Vermont, more than a week in advance of this litigation so that he could prepare this case with his attorneys. No showing was made that the plaintiff suffered any ill effects from the unsuccessful dilatation. The doctors at the Geisinger Medical Center found him to be "well developed, well nourished and in no acute distress." The plaintiff conceded that he ate regularly, gained eight pounds, made a number of friends at Lewisburg, and thought that Lewisburg was "not really a bad place."

Because of his medical problem, the plaintiff has been designated to the Federal Medical Center at Springfield, Missouri, where his medical needs can be adequately and expertly fulfilled. It is the mission of the Medical Center at Springfield to afford evaluation and treatment with the objective of restoring the patient to health. When that result is achieved, it appears that the plaintiff will be transferred to one of the major penitentiaries, such as Lewisburg. In such custody, he would have a variety of vocational and educational opportunities available to him. Each of the major penitentiarys' educational offerings include a program leading to a college degree, and a broad range of vocational opportunities, some forms of woodworking are available at certain of the federal penitentiaries.

The physical accommodations for custodial care and treatment, the programs for rehabilitation, education and vocational training, as well as the quality of the staff in the federal correctional system, are superior to those available in the Vermont Correctional Department.

Prior to the plaintiff's transfer to the custody of the Bureau of Prisons, the plaintiff had demonstrated no serious behavioral problems. He had adjusted well to the custodial environment where he was placed. Except for an apparent deficient sense of retribution for his offense, the plaintiff has

---

sation, since plaintiff was engaging the only phone in the Lewisburg hospital.

While at Lewisburg the plaintiff's family did not visit him, since, in their view, the 340 mile round trip from Hamden, Connecticut, to Lewisburg could not have been accomplished in a single day. Plaintiff did receive one visit by a friend.

The testimony indicated that the distances between plaintiff's parents' home in Hamden, Connecticut, and the prison in Windsor, Vermont, and Lewisburg, Pennsylvania, are approximately the same. Battick's parents also testified that they did visit their son during his stay at the Medical Center Hospital at Burlington, Vermont, which is some 270 miles distant from their home. The mileage between Hamden, Connecticut, and St. Albans, Vermont, is about 300 miles.

12. Dr. DeMeules, plaintiff's physician, indicated that the differences in treatment methods were clearly within the area of a doctor's professional judgment; and that an ordinary thoracic surgeon, confronted with a patient such as the plaintiff, would initially avoid use of both a general anesthesia and the radiation hazards of fluoroscopy.

manifested a constructive desire to acquire skills and learning that should serve him well when he is eventually returned to societal living outside a structured environment. There is no reason to believe that federal custody will impair or obstruct this trend. The plaintiff's transfer to the federal prison system was made entirely for administrative reasons and was not designed to serve any disciplinary or punitive purpose.

As a non-federal prisoner in the custody of the Bureau of Prisons, the plaintiff is classified as a Special Offender, pursuant to the Bureau's Policy Statement No. 79000.47, dated April 30, 1974.[13] The classification of Special Offender is composed of eight sub categories which include non-federal state prisoners.[14]

All prisoners who are classified as Special Offenders are not subject to transfer from one federal facility to another without clearance from the Central Office of the Bureau of Prisons. The purpose of this classification for state prisoners is to enable the Bureau to know exactly where each state prisoner is at all times and to provide this information immediately on request of the state correctional agency. Transfers of federal prisoners who are not classified as Special Offenders are routinely moved within the system from one facility to another at the instance of the wardens concerned, without clearance by the Central Office.

Apart from the label of "Special Offender" there is no basic difference in the treatment of state contract prisoners and ordinary federal prisoners who are not so classified. The classification has no effect on the type of custody imposed. The designation of Special Offender imposes no restriction on visitation rights. Federal prison officials assured the court that there is no

---

**13.** BASIS FOR DESIGNATION. For the purpose of this Policy Statement, an inmate who falls into any of the following categories should be designated "Special Offender."

1. *Non-Federal Offenders.* Includes all offenders in Bureau of Prisons facilities serving non-federal commitments under a valid contract with the non-federal authority. This does not include offenders serving concurrent federal and non-federal sentences nor District of Columbia offenders unless one of the following categories is applicable.

2. *Offense and Prior Record.* Cases where official investigative reports show that an offender was involved in sophisticated criminal activity of an organized nature, or was a close or frequent associate of individuals involved in organized criminal activity.

3. *Protection Cases.* Those offenders whose lives would be in grave danger if confined in the same facility with certain other offenders because of cooperation with the government or other valid reasons.

4. *Extreme Custody Risks.* Extremely dangerous offenders whose escape attempts or other disruptive activities have placed or would likely place the lives of others in serious danger.

5. *Subversives.* Members of subversive organizations which advocate overthrow of the government, or violation of the civil rights of others.

6. *Cases of Notoriety.* Offenders whose cases have caused broad national publicity or whose presence in the community would probably generate undue adverse public reaction.

7. *Threats Against High Government Officials.* Those serving sentences for making such threats, and offenders who make such threats while confined for unrelated offenses.

8. *Other.* In the judgment of the Warden, or his designee or Central Office officials designated by the Assistant Director, Correctional Programs Division, any offender who does not fall within the categories above, yet requires especially close supervision for his own protection or the protection of others.

**14.** After the close of evidence, the issue of the plaintiff's classification as a "Special Offender" in the federal prison system became of special concern to the court in light of the decision of the Second Circuit Court of Appeals in *Cardaropoli v. Norton*, 523 F.2d 990 (2d Cir. 1975). On its own motion, the court held an evidentiary hearing on January 12, 1976, to adduce further facts bearing on the plaintiff's status as a "Special Offender." The plaintiff, then in custody at the Federal Medical Center at Springfield, Missouri, was denied a request to appear personally to rebut the defendant's presentation of evidence in this matter. However, he was afforded the opportunity to produce rebuttal evidence by way of deposition. The plaintiff elected against filing a deposition, but did submit an affidavit to the court regarding his classification as a "Special Offender."

reason why Vermont prisoners in federal custody cannot be reclassified as to custody from maximum to medium security facilities. However, it is understood by both parties to the transfer contracts that if a Vermont prisoner becomes eligible for designation to medium or minimal security custody, the State of Vermont would cause the state prisoner to be returned to the Vermont medium security facility. To this end, Vermont prisoners in federal custody are periodically, and at least twice each year, interviewed at the federal facilities for purposes of reclassification and determination of parole eligibility.

While the Special Offender classification has no adverse effect on visitation or the nature of the custody imposed, the designation by its very terms brands the state prisoner and members of the population with a stigmatic and derogatory classification. Uninformed prison personnel and ordinary federal prisoners are unlikely to make the fine distinction between non-federal prisoners and other Special Offenders who have been involved in "sophisticated criminal action of an organized nature" or are associates of organized criminals. Neither are they apt to make the distinction between the other categories, such as informers, extremely dangerous offenders, notorious criminals, subversives and the like.

A more appropriate designation, simply as a non-federal prisoner, would apparently fulfill all the administrative needs of both state and federal correction officials and the Central Office. Such a classification would promote the need to have state prisoners readily available for state purposes without the stigma inherent in the Special Offender label.

At the conclusion of the trial in chief, the plaintiff was returned to the federal prison system. He arrived at the Springfield medical facility on November 6, 1975. He is one of thirty Special Offenders in a population of 1,000. He was assigned to surgical care, but within the general population. He will not be transferred until his medical needs are met. In addition to his esophagus problem, corrective orthopedic surgery on his leg is contemplated. He has elected to take four courses in the college program at Springfield.

At the conclusion of the trial, twenty-one Vermont prisoners had been transferred to federal custody. Approximately ten have been returned to Vermont; of these, two were returned for programming and one was paroled. The court finds that the plaintiff's transfer to federal custody will not impair his conditional release under the currently prevailing procedures applicable to all Vermont offenders.

### Conclusions

The question for decision is whether the Vermont statute, 28 V.S.A. § 706(b), and its federal counterpart, 18 U.S.C. § 5003, as applied to the plaintiff's transfer to the federal system, violated rights protected by the Constitution of the United States. In searching this question, there is no need to plow again the ground covered in the prior decision of *Rebideau v. Stoneman, supra,* 398 F.Supp. 805. We turn first to the plaintiff's contention that the procedure incident to his transfer was a denial of due process within the proscription of the Fourteenth Amendment.

The statute which gave rise to this action provides:

(a) The commissioner may enter into and execute a contract or contracts with the United States for the transfer of any inmate from any facility to a federal correctional facility, when, in his opinion, the inmate needs particular treatment or special facilities available at the federal correctional facility; or, all in-state treatment and rehabilitative programs available for the inmate have been considered and found unsuitable; or, all in-state security and custody alternatives for the inmate have been considered and found unsuitable; or, the inmate voluntarily requests transfer.

(b) Notwithstanding any other provision of law, an inmate transferred to a federal correctional facility shall, unless otherwise agreed in a contract or contracts, be

subject to the same law, rules, regulations, and procedures applicable to inmates committed for violations of laws of the United States, not inconsistent with the sentence imposed. Such laws, rules, regulations, and procedures applicable to Vermont prisoners confined outside Vermont may include but are not limited to matters of discipline, classification, segregation, visiting, mail, clothing or dress, use of telephones, personal property, employment, work release, furlough and transfer. 28 V.S.A. § 706.

Although no disciplinary action was involved, the Commissioner of Corrections was alert to recognize that operation of this statute might have the effect of imposing a "grievous loss" on a Vermont prisoner transferred to a federal correctional facility. Accordingly, a procedure was established to insure that each of the minimal procedural requirements established in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) was duly observed and kept.

Where the transferred prisoner's institutional behavior is not involved and disciplinary action is not a factor, there is highly respectable and persuasive authority to the effect that need for procedural safeguards is outweighed by the administrative discretion of prison authorities. *See United States ex rel. Gereau v. Henderson,* 526 F.2d 889 (5th Cir. 1976); *United States ex rel. Haymes v. Montanye,* 505 F.2d 977 (2d Cir. 1974). Nonetheless, in the transfers incident to the closing of Windsor, the Vermont legislature imposed various requirements to guide and direct its correctional officials in the exercise of their administrative discretion to protect the plaintiff and others similarly situated against arbitrary and capricious action. And the defendant commissioner elected to establish procedural safeguards. In consequence, the plaintiff has been afforded all the procedural rights due him under federal and state requirements.

Immediately upon being notified that he was being considered for transfer out of Vermont, the plaintiff appeared in person before the Classification Committee. All alternatives were discussed. After the Classification and Transfer Committee recommended transfer, the plaintiff requested that he be represented by Richard Knight, as lay counsel, to appear with him at the hearings before the hearing officer. His request was granted.

The hearing before the hearing officer, Avery Smith, was conducted on proper notice. The plaintiff conceded in court that the hearing officer was fair. He had full opportunity to present evidence in person and he called witnesses who testified in his behalf. The hearing officer stated the reasons for his decision in writing. The hearing officer was neutral and detached. He had no participation in the administrative process prior to the hearing, although he had served many years in the correctional system. The plaintiff was afforded procedural safeguards that were within and beyond the precepts of *Wolff v. McDonnell,* 418 U.S. at 570, 94 S.Ct. 2963. *See also id.* at 592, 94 S.Ct. 2963 (Marshall, J., dissenting in part); *Morrissey v. Brewer,* 408 U.S. at 485–486, 92 S.Ct. 2593. All of the proceedings were carefully reviewed by the defendant Stoneman before the order for transfer was made.

The plaintiff now advances the claim that he was not represented by legal counsel. He urges that since no discipline nor punitive considerations were involved in the transfer, the demands of due process required that the plaintiff be afforded the active assistance of legal counsel to gather expert testimony and skillfully explore the issue of whether or not there were in-state alternatives to the transfer to federal custody.

It does not appear that the plaintiff ever requested to be represented by legal counsel at the hearing before the hearing officer. He asked and received the assistance of lay counsel of his choice. Indeed in his complaint he demanded "the right to be assisted by lay or legal counsel."

In any event, the right to be represented by legal counsel is not an essential

element of due process in prison disciplinary proceedings. *Wolff v. McDonnell,* 418 U.S. at 959, 94 S.Ct. 2963. This court has held that the right to legal counsel does not attach to administrative hearings. *Carlson v. Moeykens,* Civ. No. 74–224 (D.Vt., January 11, 1975, as amended March 13, 1975) (Coffrin, J.).

■ The plaintiff is intelligent and completely understood the issues involved in the hearings. He was assisted by trained and competent lay counsel of his choice and had easy access to the Defender General's office. The plaintiff was not in the posture of one accused; he was merely designated for possible transfer because the State of Vermont had provided no proper facility to sustain him here. *See Wolff v. McDonnell,* 418 U.S. at 959, 94 S.Ct. 2963; *Gagnon v. Scarpelli,* 411 U.S. 778, 787, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Croom v. Manson,* 367 F.Supp. 586 (D.Conn.1973).

■ The plaintiff further contends that whether or not he was entitled to legal counsel, the hearing officer's findings were so deficient that they resulted in a denial of due process. As concluded above, the decision to transfer a prisoner from one facility to another is entrusted by the Vermont statutes to the discretion of the Commissioner of Corrections. His final decision is administrative, rather than judicial. *See United States ex rel. Haymes v. Montanye,* 505 F.2d 977 (2d Cir. 1974).

The hearings officer's findings were brief. Recommendation was based on the first criterion since the hearing officer was not persuaded the second criterion had been met. His reasons were supported by the evidence presented to him and their validity is confirmed by the evidence presented in this court. The facts reported by the hearing officer were sufficient to enable the reviewing authority "to determine whether appropriate, rational, and consistent criteria have been adopted and followed" within the teaching of *Cardaropoli v. Norton,* 523 F.2d 990, 998 (2d Cir. 1975). They were also sufficient to protect the plaintiff and other transferees against "arbitrary and capricious decisions or actions based upon impermissible considerations." *United States ex rel. Johnson v. Chairman, N.Y.S. Board of Parole,* 500 F.2d 925, 929 (2d Cir. 1974) *vacated as moot, Regan v. Johnson,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974).

Before the plaintiff was actually transferred, the defendant took pains to confirm that competent medical treatment would be afforded the plaintiff before he was moved into the federal system. And subsequent history of the plaintiff's case establishes that extensive and competent medical care has been provided.

The record further establishes that the transfer committee, the hearing officer and finally the defendant, as Commissioner of Corrections, gave appropriate consideration to retaining the plaintiff in Vermont in the facilities available here. Although the defendant was not bound by their conclusions, his final decision to transfer was based on the lack of correctional facilities and rehabilitation programs for long term offenders who, for reasons of security and the nature of their offenses, were required to serve their sentences in close custody. Since his decision to transfer the plaintiff was not arbitrary nor generated from capricious or impermissible reasons, it will not be overthrown.

■ There remains a further question that has emerged after the plaintiff was received into the federal prison system; that is, his classification as a Special Offender, pursuant to United States Bureau of Prisons Policy Statement 7900.47 (April 30, 1974). The consequences of this classification, as applied to federal prisoners who come within the last seven categories specified in the Policy Statement are sufficiently serious that the designation ". . . may not be imposed in the absence of basic elements of rudimentary due process." *Cardaropoli v. Norton,* 523 F.2d at 995. This, of course, involves the decision-making process. The decision must have ". . . a fair and feasible basis by which the arbitrary imposition of the Special Offender classification may be prevented." *Id.* at 996.

There is no occasion to call upon a fact finder to determine whether the plaintiff is a non-federal resident in the federal prison system. The consequences of loss of social furloughs, work release and detriment to early parole are not visited upon the plaintiff. It is clear from the evidence that these advantages are controlled by the State of Vermont and would not be available to the plaintiff had he remained in Vermont as a long-term offender in high security custody. And the State has provided adequate measures to ensure that the plaintiff's status in this regard shall be periodically reviewed.

■ It also must be recognized that non-federal prisoners require greater case management supervision than that of the ordinary federal inmate. Yet the characteristics of the categories applied to federal offenders are such that to be included in the classification and labeled a Special Offender is certain to impose a stigma that is unwarranted merely because the non-federal prisoner is detained on a state conviction instead of a federal offense. More importantly, the classification is not in keeping with the provisions of 28 V.S.A. § 706 to the effect that ". . . an inmate transferred to a federal correctional facility shall, unless otherwise agreed in a contract or contracts, be subject to the same law, rules, regulations, and procedures applicable to inmates committed for violations of laws of the United States."

The court is satisfied that this offensive designation can be removed administratively by the defendant and the Bureau of Prisons. This result could be accomplished without disrupting the plaintiff's custody in the federal system, and consistent with the need for central office control and efficient case management of non-federal prisoners.

■ The plaintiff advances the further claim that his transfer to the federal system imposes cruel and unusual punishment in violation of the Eighth Amendment. The court is called upon to consider the consequences of the plaintiff's transfer in the light of "evolving standards of decency that mark the progress of a maturing socie-

ty." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).

■ At the outset it is well to restate that, contrary to his contention, the plaintiff's transfer is not punitive, although it is involuntary and not to his liking. In *Rebideau v. Stoneman*, 398 F.Supp. at 813 et seq., the three-judge panel explored and measured the variances between the correctional systems of Vermont and the United States. We held:

> To the extent that 28 V.S.A. § 706(b) engrafts variant federal treatment and prison procedures on inmates transferred to federal custody, none have been shown to offend rights which are constitutionally protected. *Id.* at 814.

The plaintiff contends that his transfer into the federal system visits a punishment upon him solely because he is a long-term prisoner and that his status in this category has been administratively determined. He argues that the punishment caused by his transfer is because of this status and not for any act which he committed and thereby inflicts cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments within the doctrine of *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, *rehearing denied* 371 U.S. 905, 83 S.Ct. 202, 9 L.Ed.2d 166 (1962).

*Robinson* held that punishment inflicted by application of the local law of California, which imprisons a person for narcotic addiction as a criminal offense "even though [the subject] never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment . . . ." *Id.*, 370 U.S. at 667, 82 S.Ct. at 1421. Criminal sanctions imposed for chronic alcoholism were similarly condemned in *Powell v. Texas*, 392 U.S. 514, 532, 88 S.Ct. 2145, 20 L.Ed.2d 1254, *rehearing denied* 393 U.S. 898, 89 S.Ct. 65, 21 L.Ed.2d 185 (1968) (dictum).

■ The instant case is not within these patterns. In the first place, the transfer is not punitive. Secondly, his status as a long-term offender was not determined by

the defendant. It results from the sentence of the courts of Vermont as a lawful sentence for the crime of murder.

Of course the plaintiff has suffered substantial personal disadvantage. His access to the Vermont Defender General for Corrections has been reduced. Yet there has been no interruption of continuing communications between the plaintiff and his counsel. The trial of the instant case attests to the fact that he has had every opportunity to resort to skillful and dedicated counsel with full discovery and compulsory process to summon all the witnesses he sought to produce. He was transferred to Vermont well in advance of trial to assist in the preparation of his case and all at the expense of the State of Vermont. There has been no impairment of the plaintiff's right to counsel within the teaching of *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) and *Ex parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034, *rehearing denied*, 312 U.S. 716, 61 S.Ct. 823, 85 L.Ed.2d 1146 (1941).

Visitation by friends and relatives is less accessible, but such support is not foreclosed. The plaintiff's relationship with Dr. DeMeules has been interrupted. It has been replaced by expert surgical care in extensive federal medical facilities and the Geisinger Medical Center. Specialist services were provided and will continue. There has been no denial of medical care nor any showing of inadequacy of medical treatment that rises to the level of cruel and unusual punishment. *Compare Martinez v. Mancusi*, 443 F.2d 921 (2d Cir. 1970).

The Vermont General Assembly substantially revised the state's correctional system and added new provisions to implement and develop new programs in keeping with the purpose stated in the enactment. 1971 No. 199 (Adj. Sess.) effective July 1, 1972. The enactment was designed to respond to the needs of the prisoners as well as those of the state, resulting from the closing of the maximum security facility and the transfer of some of its residents to federal correctional institutions. 28 V.S.A. § 706. *See Rebideau v. Stoneman*, 398 F.Supp. at 808–09. There is nothing about this solution of the state's correctional need for providing maximum security protection for certain of its prisoners ". . . that justifies a finding that involuntary out-of-state transfer of a convicted prisoner is either cruel or unusual punishment." *Hoitt v. Vitek*, 361 F.Supp. 1238, 1251 (D.N.H.1973) *aff'd* 497 F.2d 598 (1st Cir. 1974). And while the plaintiff's transfer is not to his liking and has some adverse consequences which attend any distant transfer, his medical care has been continuing and his physical condition is not impaired; indeed it has improved. On the facts presented his transfer does not offend the Eighth Amendment.

Finally, we reach the plaintiff's claim that the defendant's order transferring him to the federal prison system violates Vermont statutory mandates [15] as directed in 28 V.S.A. §§ 1, 2, 101 and 102.

---

**15.** The complaint asserts the claim that the plaintiff's confinement outside the state offends Section 64, Chapter II of the Vermont Constitution which provides:

> To deter more effectually from the commission of crimes, by continued visible punishments of long duration, and to make sanguinary punishments less necessary, means ought to be provided for punishing by hard labor, those who shall be convicted of crimes not capital, whereby the criminal shall be employed for the benefit of the public, or for the reparation of injuries done to private persons; and all persons at proper times ought to be permitted to see them at their labor.

Since the claim was not advanced at the trial nor was it argued orally or in the written memorandum of law submitted, it apparently has been abandoned and rightly so.

The provision is of ancient origin and was included in the first Constitution of Vermont adopted in 1777 when public display of penal sanctions was regarded as an important deterrence. It justified confinement at hard labor as an alternative for offensive "sanguinary" punishment. The opportunity for public visibility at hard labor was not made mandatory; the provision merely states that "all persons at proper times ought to be permitted to see them at their labor." The privilege is assigned to the public. Clearly, it was not designed to protect the person punished to be exposed to constant public view within the state.

Section 101 is a legislative grant of authority to the correctional department; section 102 defines the powers and responsibilities of the commissioner of corrections.

Plaintiff renews the argument advanced in *Rebideau, supra,* that the defendant's resort to 28 V.S.A. § 706 to accomplish the closing of the maximum security facility for economic reasons and the resulting transfer of the former Windsor inmates, violated rights conferred upon the plaintiff and responsibilities imposed upon the commissioner by the statutory provisions referred to above. These provisions were enacted by the General Assembly in 1971. Section 706 was enacted in 1975 to amend the correctional law of 1971 to authorize transfer to the federal system incident to the Windsor closing. The plaintiff asserts that 28 V.S.A. § 801,[16] which requires the correctional department to establish and maintain services for its inmates is violated by the ministering to his special medical needs in medical facilities maintained by the Bureau of Prisons, outside of Vermont.

▆▆▆ The 1975 amendment was designed to accommodate the demands of a contingency that did not confront the Legislature in 1971. The state legislature acted with full knowledge of the prior legislation on the subject. The court so held in *Rebideau v. Stoneman,* 398 F.Supp. at 813. The remedial nature of the last enactment entitled it to a liberal construction. *Conn v. Brattleboro,* 120 Vt. 315, 321, 140 A.2d 6 (1958). The construction proposed by the plaintiff would render the later statute ineffective and defeat its very purpose. The court, in applying the law of Vermont, is constrained against an interpretation of the

statute which will produce such a consequence. *See In re Roberts,* 111 Vt. 91, 93, 10 A.2d 1 (1940). The court has stated above that the care and treatment of the plaintiff's physical condition in the medical facilities provided by the Bureau of Prisons does not trench on constitutionally protected rights. Such care and treatment is entirely consistent with the requirements of 28 V.S.A. § 801 which concerns medical care for residents of correctional facilities within the state.[17]

In sum the court holds that the transfer of the plaintiff Battick to the custody of the United States Bureau of Prisons, pursuant to the provisions of 28 V.S.A. § 706, does not offend the Constitution of the United States. His present detention in federal custody is consistent with the constitution and statutes of Vermont except as to his classification as a Special Offender. Accordingly, his petition for injunctive relief is denied. The court will retain jurisdiction for the limited purpose to afford the defendant Stoneman a reasonable opportunity to effect the correction of the plaintiff's status as a Special Offender by appropriate consultation with the Director of the United States Bureau of Prisons. It is so ORDERED.

### Appendix A

The text of Vermont Department of Corrections Policy No. 891 as it relates to procedures for recommending out-of-state transfers reads as follows:

*Classification Recommendation*

When the classification committee of any facility makes a classification recommendation for out of state transfer, the

---

**16.** § 801. *Medical care of inmates*

(a) The department shall establish and maintain standards for the health and medical services for each correctional facility. When deemed advisable, an inmate may be taken to a medical facility outside the boundaries of the correctional facility wherein he is confined, but the department shall provide safeguards when deemed necessary for the custody of the inmate while he is confined at a medical facility outside the correctional facility.

(b) Upon admission to a correctional facility, each inmate shall be given a physical examination insofar as is practicable, and shall be kept apart from the other inmates for a period of quarantine until he is known to be free from communicable disease.

(c) Officers and employees of any correctional facility shall render available medical assistance to any inmate when there is reason to believe that the inmate is in need of assistance.

**17.** See text of statute at note 16.

recommendation will be forwarded to the Assistant Director of Community Correctional Centers for review and coordination. If he feels the recommendation is justified, he will forward the classification materials to the Commissioner, and will ask the Department hearing officer to conduct a hearing in accordance with the requirements set forth below.

As part of the classification package included with the recommendation, the committee will include the specific reasons for recommending transfer, and which of the criteria in this policy they find the resident meets. This material will also include a statement of the in-state alternatives which have been considered, and the reasons why they are inappropriate.

### Movement of a Resident Programmed at SCF–Windsor

For a resident currently at the State Correctional Facility-Windsor, the classification committee at that facility will develop a written explanation of the reasons for the proposed transfer. This recommendation will be presented to the Transfer Committee. The Transfer Committee may also originate a transfer recommendation. If the committee endorses the recommendation, it will be forwarded, through the Committee Chairman, to the Commissioner. The Commissioner will direct the designated hearing officer to hold a hearing in accordance with the procedures laid out below. The Transfer Committee recommendation will provide a clear written statement which includes the reasons for the recommendation, the criteria in this policy which applies to the case, what in-state alternatives have been considered, and the reasons for their rejection.

### Hearing Procedure

1. When a hearing is requested on a case involving possible out of state transfer, the resident will receive written notice of the hearing, including an explanation of his rights in the hearing, and the reasons for the proposed transfer, at least 24 hours ahead of the time scheduled for the hearing. A copy of the notice will be sent to the Superintendent at the holding facility. The notification will be done through the central office.

2. The inmate may waive the hearing, in writing, if he chooses.

3. The aim of an out of state transfer hearing is to determine whether or not the resident meets one or more of the criteria defined in this policy.

4. The resident will be allowed to be present at the hearing. He may testify on his own behalf, call witnesses or present documentary evidence, so long as this is not unduly hazardous to institutional safety or correctional goals. The resident may be represented by lay counsel from the facility staff where this is feasible.

5. After the hearing is held, the hearing officer will notify the Commissioner, in writing, of the results of the hearing. Based on this report, and the material included in the recommendation, the Commissioner will make the final decision. The Commissioner will notify the Superintendent of the holding facility and the resident, in writing, of his decision, including a copy of the hearing officer's report. This written notification will be given to the resident.

6. If a prior hearing cannot be afforded because the delay required would endanger the safety of the resident or the security of the facility, the Commissioner may order the transfer, and the hearing may be held up to 10 days after the resident is moved. This hearing shall be conducted before a hearing officer designated by the Commissioner, and the reasons for the delay will be given to the resident in writing.